UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NAVISION SHIPPING COMPANY A/S,

                       Plaintiff,                             07 Civ. 9517 (DC)

   - against -                                               ECF CASE

YONG HE SHIPPING (HK) LTD., PROSPER
SHIPPING LIMITED, JIANGSU FING AGENCY LTD.,
JIANGSU FAREAST INTERNATIONAL SHIPPING
AGENCY LTD., THE OLD EASTERN
MEDITERRANEAN CO SA, CHINA MARINE
SHIPPING AGENCY TIANJIN COMPANY LTD.,
LIANYUNGANG FAREAST INTERNATIONAL
SHIPPING AGENCY CO. LTD., and SHANGHAI
FAREAST INTERNATIONAL SHIPPING AGENCY
CO. LTD. a/k/a FEISA,

                       Defendants.
------------------------------------------------------------X

**DECLARATION OF NIKOLAI CHRISTOPHER IVANOV PURSUANT TO
28 U.S.C. §1746 IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO VACATE MARITIME ATTACHMENT AND/OR DISMISS THE ACTION**

I, **NIKOLAI CHRISTOPHER IVANOV**, of Holman Fenwick & Willan International, 83 Akti Miaouli & Flessa Street, 185 36, Piraeus, Greece, hereby affirm as follows:

1.    I submit this Declaration based on facts and information known to me personally, as well as documents and information made available to me, all of which I believe to be true and accurate.

2.    I make this Declaration in support of Plaintiff Navision Shipping Company A/S's ("Navision") opposition to a motion filed by Shanghai Fareast International Shipping Agency Co. Ltd. ("Defendant" or "Shanghai Fareast") moving to vacate the maritime attachment issued herein and/or dismiss the action.

3.    I am a British National and a solicitor of the Supreme Court of England & Wales having qualified in 1998. I am a senior solicitor in Holman Fenwick & Willan International of the above address. Holman Fenwick & Willan International is the Greek branch office of Holman Fenwick & Willan, a leading international law firm specialising in commercial and maritime law. My area of speciality is shipping and transport law, including predominantly work in relation to

bill of lading and charterparty disputes. In this capacity I have acted on behalf of owners, charterers, cargo interests, P&I Clubs and ship management companies.

4.  I have been requested by the Plaintiff Navision and their US attorneys, Messrs. Lennon Murphy & Lennon LLC, to provide a Declaration setting out my opinion under English law on the validity of Navision's maritime claim against the Defendant, Shanghai Fareast and in particular, to respond to the points raised in the Declaration of Mr. Ernest Tai Ming Yang of Dibb Lupton Alsop in support of Shanghai Fareast's Motion to Vacate the Attachment and/or Dismiss the Action.

5.  The information on which my opinion is based, has been provided to me by Navision, their P&I Club, Danish Defence Club and Messrs Lennon Murphy & Lennon LLC. The information contained in this Declaration is true to the best of my knowledge and I believe the opinions I express herein to be correct.

6.  I have read the Declaration of Mr. Ernest Tai Ming Yang and have responded below to the points raised by him.

7.  I confirm that for the reasons set out below, it is my firm opinion that Navision has a prima facie valid maritime claim against Shanghai Fareast under English law.

**Background**

8.  On 18 April 2007, Navision chartered the vessel M/V "BRAVE JOHN" (hereinafter "the Vessel") from owners, Oresteia Shipping Ltd., Malta. The charter was concluded on an amended NYPE 1946 form, and was for a period of minimum 3 to about 5 months (+/- 15 days at charterers' option).

9.  On 12 July 2007 Navision sub-chartered the vessel to Yong He Shipping (HK) Ltd. (hereinafter "Charterers") for a one time charter trip of about 60 days WOG. The charter is evidenced by a fixture recap dated 12 July 2007[1].

10. Shanghai Fareast was appointed by Charterers as port agents for the vessel's call at Shanghai in August 2007.

11. On 22 August 2007, the Master provided a letter of authorisation to Shanghai Fareast, authorising the latter to sign bills of lading on his behalf. Such authorisation was expressly envisaged and indeed required under the charterparty. The terms of such authorisation were clearly set out in the letter. The terms were expressly acknowledged and accepted by Mr Zhuo Zong Gen of Shanghai Fareast, who signed the letter.

12. Contrary to the strict terms of agreement as evidenced in the letter of authorisation, Shanghai Fareast arranged for the issuance and release of antedated, clean on board bills of lading which had been marked "freight prepaid". I am advised that as a direct consequence,

---

[1]  Mr Yang's Declaration refers to an alleged charterparty dated 12 July 2007 between Oresteia Shipping Ltd. and Yong He Shipping (HK) Ltd direct. The source of this document is unclear to me. I am instructed that the charterparty between Orestia Shipping and Navision is or appears to be invalid. My opinion is based on this presumption. This seems to be borne out by the fact that the letter of authorisation refers to "disponent owners", ( Navision Chartering A/S).

HFWGR\152612-1                                                2

Navision was unable to exercise a lien on the cargo at discharge ports in order to secure unpaid hire. Navision claim to have suffered significant losses as a result.

**Charterparty dated 18 April 2007**

13. The relevant terms of the Charterparty dated 18 April 2007 between Oresteia and Navision are as follows:

<u>Clause 8</u>

> "...*The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency;... [the Captain] is to sign **or when required by Charterers, authorise the Charterers or their agents to sign**, Bills of Lading **on his behalf** for cargo as presented, in conformity with Mate's receipts*". [clause amendments in bold]

<u>Clause 18</u>

> "*That the Owners shall have a lien upon all cargoes, and all sub-frieghts, sub-hires for any amounts due under this Charter...*".

<u>Clause 42:</u> Bills of Lading

> "*Charterers' Bills of Lading to be used if required by Charterers*".
>
> ...
>
> "*...Charterers to make best endeavours to incorporate a lien clause in all bill(s) of lading issued under this charterparty...*".

**Sub-charterparty dated 12 July 2007**

14. The sub-charterparty dated 12 July 2007 between Navision, as disponent owners and Charterers, expressly states that the terms of such sub fixture are... "*Otherwise as per ows btb cp logically amended*" thereby incorporating the terms and conditions of the head charterparty dated 18 April 2007 between Oresteia and Navision.

**Scope of my Opinion**

15. I have been asked to provide my opinion on whether, as a matter of English law, there is a valid cause of action against Shanghai Fareast for the losses suffered by Navision, especially taking into account the opinion provided in the Declaration by Mr Ernest Tai Ming Yang. In that context, I have been asked to comment on the following issues:

(1) Did Shanghai Fareast have the right under English law to issue and release bills of lading marked "freight prepaid" or was the Master's Letter of Authorisation prohibiting the issuance of such bills binding on Shanghai Fareast?

(2) Were the charterparty terms incorporated into the bills of lading?

(3) What, if any, lien rights would Navision have?

  (4) Under English law, is Navision entitled to bring a claim against Shanghai Fareast?

**(1). Did Shanghai Fareast have the right under English law to issue and release bills of lading marked "freight prepaid" or was the Master's Letter of Authorisation prohibiting the issuance of such bills binding on Shanghai Fareast?**

  a. It is correct that under English law the general effect of clause 8 of an *unamended* NYPE 1946 charterparty is that the Master is deemed charterers' agent for the purposes of employment and agency, and charterers are entitled to present to the Master, for his signature, bills of lading which contain or evidence contracts between the shippers of goods and the shipowners[2]. The time charterer has power to determine the form and content of the bills of lading, provided always that such bills do not contain extraordinary terms or terms manifestly inconsistent with the charterparty.

  b. It is also correct that *the Nanfri*[3], on which Shanghai Fareast place heavy reliance, supports the general proposition that charterers are entitled, under the terms of the charterparty, to issue bills of lading marked "freight prepaid" and/or without any lien clause, and a Master is not entitled to refuse to sign such "freight prepaid" bills even if the issuance of such bills may prejudice owners' right of lien on cargo or freights under the charterparty[4].

  c. However, in my opinion, *the Nanfri* decision is clearly distinguishable from the present case and the general position set out above does not apply. I say this for the following reasons:

  d. Firstly, in the present case there is no evidence of commercial necessity for "freight prepaid" bills being issued. Indeed, quite the opposite, the sub-charter imposes on Charterers a positive duty to use their best endeavours to ensure that the lien clause is incorporated into the bill of lading. It seems common ground that a "freight prepaid" endorsement on a bill would operate contrary to this.

  e. Secondly, and more decisively, in the present case we are *not* dealing with an *unamended* NYPE clause 8. An *unamended* clause 8 permits charterers and/or their agents to issue and sign bills of lading themselves on behalf of shipowners, rather than presenting the bills to the master for signature[5]. However, in this case the relevant NYPE clause 8 has been *amended* to require prior and separate authorisation from the Master before bills of lading can be signed by charterers or their agents on his behalf. In *The*

---

[2] *The Berkshire* [1974] 1 Lloyd's Rep. 185
[3] *The Nanfri* [1979] 1 Lloyd's Rep 201
[4] In considering the *Nanfri* decision, the Court should be mindful of the background to the case. The *Nanfri* case involved issuance of bills of lading used in the Great Lakes grain trade, and in that trade it was usual, indeed commercially imperative, for bills to be marked "freight prepaid" without reference to the terms of any time charter. Owners sought unilaterally to impose restrictions on charterers and the master regarding the issuance of freight prepaid bills of lading, and the English Courts held that owners were not entitled to so interfere.
[5] *The Berkshire*: See footnote 2 above.

*Berkshire* [1974] 1 Lloyd's Rep 185, the English Court envisages that such authorisation be given either by special charter clause (not the case here) or "*by agreement after the charterparty is signed*"[6].

f.  Therefore, under the amended clause 8, express authorisation by agreement was required in order to transfer to Charterers and their agents the right to issue and sign bills of lading on owners' behalf. This right was ordinarily vested in the Master but was transferred to Charterers and their agents under specific terms and conditions to be complied with when issuing the bills. The terms of this agreement are evidenced in the signed agreement entitled "*Authorisation to Sign Bills of Lading on My Behalf*" and dated 22 August 2007 ("Letter of Authorisation"). The Master was entitled to present this agreement as he did, and to set out the terms and conditions for granting such authorisation to Charterers and Shanghai Fareast. A copy of the Letter of Authorisation is attached for the Court's convenience.

g.  The Letter of Authorisation was signed by the Master and Mr Zhou Zong Gen for Shanghai Fareast. Mr Zhuo's signature is a clear and unequivocal acceptance and agreement by Shanghai Fareast to be bound by the terms and conditions contained in the Letter of Authorisation. The Letter of Authorisation therefore formed a separate and enforceable agreement. Had Shanghai Fareast disagreed with the authority terms they could very well have indicated so or qualified their acceptance of the same. They did not.

h.  Therefore, in the present case we are not dealing with a *Nanfri* situation. Shanghai Fareast elected to enter into an agreement with Navision whereby authorisation to issue and sign bills of lading was passed to them on acceptance of terms as set out in the Letter of Authorisation. Consequently, Navision and Shanghai Fareast were under a duty to comply with the terms and conditions contained in the Letter of Authorisation.

i.  I understand that Shanghai Fareast has challenged the validity of the Letter of Authorisation, and I deal briefly with their challenges below.

Terms inconsistent with the rights granted in the charter

j.  As already stated above, the Letter of Authorisation transfers to Charterers and their agents the right to issue and sign bills of lading, under certain terms and conditions. There is nothing hostile to or inconsistent with the charterparty within the Letter of Authorisation. Indeed, Charterers and their agents have a positive duty to ensure that Owners' liens rights are protected when issuing bills of lading. The fact that the terms of authorisation may go beyond the terms of the charter does not alter the position (indeed, this must have been envisaged given the charterparty requirement to procure separate authorisation by agreement). Moreover, there is little doubt that Shanghai

---

[6] In <u>Wilford on Time Charters</u> (2003) (the leading text ofter referred to in English Court or arbitration proceedings) at para 21.48 it states: "*In The Berkshire the master had in fact given the express authority to the charterers' agents to sign the bills of lading. Where there is such actual authority from the owners or the Master, <u>either by special charter clause to that effect of by agreement after the charter is signed,</u> then there is no doubt that the charterers or their agents may bind the owners*".

        Fareast intended to be bound by these terms as set out in the Letter of Authorisation.

"Rcvd this letter"

k.    Shanghai Fareast asserts that the annotation "*Rcvd this letter*" on the face of the Letter of Authorisation indicates an intention not to be bound by the terms of such letter. In the leading text book on Contract Law, <u>Chitty on Contracts</u> Vol I General Principles (2004 London Sweet & Maxwell) at para 12-043 it states:

"*The cardinal presumption is that the parties have intended what they have in fact said, so that the words must be construed as they stand. That is to say that the meaning of the document or of any particular part of it ought to be sought in the document itself. One must consider the meaning of the words used, not what one may guess to be the intention of the parties*"[7]

l.    The phrase '*Rcvd this letter*" on the face of the document does not convey an intention not to be bound. The notation is ambiguous and so vague as to be meaningless. In modern English law, a Court may consider it appropriate to examine the circumstances surrounding the making of the contract, when determining issues of ambiguity, but in doing so the Court will not look at the subjective intention of Mr Zhuo when signing the Letter of Intention (whatever such intention may have been). Rather the test is an objective one. The Court will determine how the language of the document would be understood by a "reasonable man" when looking at the document as a whole[8].

m.    On the clear wording of the Letter of Authorisation, there is no doubt that Shanghai Fareast viewed the Letter of Authorisation as an enforceable agreement, and by signing the document intended to be bound by its terms. The document was signed as "*Acknowledged and accepted*" which is a clear and unequivocal acceptance of the terms and conditions as set out in the document.

n.    My opinion is further supported by the express provision in the agreement that Shanghai Fareast "*will be held fully responsible in case you do not follow the above authorisation strictly*". This is clear and unequivocal language binding Shanghai Fareast and imposing strict conditions in the event of any breach of the signed agreement. Shanghai Fareast were fully aware of the obligations placed upon them under the Letter of Authorisation and nevertheless signed the document. No objection was raised as far as we are aware. In fact, quite the opposite, Shanghai Fareast fully agreed to the terms within the agreement as evidenced by the signature on the document.

Agency

---

[7] See also I.R.C. v Raphael [1935] A.C. 96, 142.
[8] Mannai Investment Co. Ltd v Eagle Star Life Assurance Co. Ltd. [1997] A.C. 749. See also <u>Chitty on Contracts</u> at para 12-043

    o.    As a matter of English law, there is no reason why an agent cannot be entitled and/or liable on a contract which it has made for his principal, or upon a separate or related contract. An agent can, for example, undertake a separate liability on a collateral contract. I refer the Court to the leading text, <u>Bowstead & Reynolds on Agency</u> (18th ed. 2006 at 9-005 in which it states that "*In all cases the parties can by the express contract provide that the agent shall be the person liable either concurrently with or to the exclusion of the principal*".[9] The question of whether an agent is deemed to have contracted personally, and if so the extent of his liability, will be deduced from the nature and terms of the particular contract and the surrounding circumstances. As in all matters of formation, the test is objective. The rules can be most easily articulated in relation to written contracts, where the use of a particular form of words may constitute an agent a contracting party, though it is on the underlying facts doubtful whether it intended to become such.

    p.    As already stated above, in my opinion Shanghai Fareast clearly viewed the Letter of Authorisation as being a binding agreement on itself, and this is supported by the points raised in paragraphs (1)l – (1)n above.

    q.    In summary, in my opinion, it is reasonably clear that Navision and Shanghai Fareast entered into a binding contract, the terms of which were set out in the Letter of Authorisation, and both parties had a duty to comply with the terms and conditions as set out in that agreement.

**(2). Were the charterparty terms incorporated into the bills of lading?**

    a.    We have not seen a copy of the reverse sides of the relevant bills of lading (Navision have not been able to procure copies of the reverse sides of the bills). Therefore, we are unable to confirm if the standard Congenbill 94 wording cited by Mr Yang at paragraph 13 of his Declaration was included on the reverse of the bills[10]. If it were, this wording would be sufficient to incorporate all charterparty clauses which are germane and related to the shipment of the cargo.

    b.    However, as Mr Yang points out (para 15), the bills fail to expressly identify the charterparty relevant to the incorporation clause, and the face of the bills appear to be silent in this regard. Therefore, it is unclear what charterparty is being incorporated. This may not matter if we are jut dealing with the head charterparty (18 April 2007) and the sub-charterparty (12 July 2007) as these contain materially back to back terms. However the position will be less certain if Charterers entered into a voyage charterparty – which we are advised is likely to have been the case. In the circumstances, we are unable to determine with any certainty on present evidence what charterparty terms have been incorporated into the bill of lading, including whether a lien clause has been so incorporated and/or what is the choice of law and jurisdiction governing the bills.

---

[9] See also Montgomerie v UK Mutual S.S. Assn [1891] 1 Q.B. 370 at 372.
[10] Mr Yang does not append a copy of the reverse of the bill of lading, and it also appears that he has not sighted the reverse.

(3) **What, if any, lien rights would Navision have?**

    a.    As stated in the background above, we have been instructed that Shanghai Fareast subsequently arranged for the issuance and release of clean on board bills of lading which were marked "freight prepaid" in direct contradiction to the terms of the "Letter of Authorisation". We are also instructed that many of these bills were antedated.

    b.    On this basis, the issuance of such bills in this manner was manifestly wrongful. The issuance of freight prepaid bills was in direct contradiction to the terms of the Letter of Authorisation.[11] It is established law, and Mr Yang appears to accept (see Mr Yang's Declaration at para 18) that the mark "freight prepaid" on a bill of lading may prejudice the right of lien that an owner may have under the bill (see below).

    c.    Furthermore, the deliberate issuance of bills with incorrect marks, including ante dating bills of lading, was unlawful[12]. The English House of Lords has held that the issuance of antedated bills of lading is prima facie good evidence of deception and the perpetration of a fraud against the receiver and/or endorsee of the bill[13]. The Master would ordinarily have been entitled to refuse to sign the bills of lading on this basis, as the bills were not in accordance with the terms of the charterparty. However, the issuance and the execution of such bills had been transferred to Shanghai Fareast under the terms of the Letter of Authorisation, and the bills were issued and released by Shanghai Fareast in this form, in breach of its legal obligations and the terms of its authorisation.

    d.    Charterers subsequently failed to pay hire. In such circumstances, Navision's recourse would be the exercise of its right to exercise a lien on the cargo and/or on sub-freights/sub-hire. The cargo was not owned by Charterers, but rather by third parties. In <u>Wilford on Time Charters</u> (2003) at 30.13 it states, "*where the bills of lading incorporate (expressly or by reference) a charterparty lien clause... the owners have a contractual right to lien the cargo, whether or not it is owned by the charterers, and this they may exercise*"[14]. Therefore, the exercise of such right of lien on cargo owned by third parties could only be established on the basis that the lien clause in the charterparty was properly incorporated into the bills of lading. As mentioned above, it is far from clear on the evidence whether it has.

    e.    Even if the lien clause has been incorporated into the bill, as Mr Yang points out, under English law the issue of whether owners are entitled to exercise a lien over cargoes owned by third parties, when the subject bills

---

[11] In my view, the fact that Mate's Receipts were similarly claused will not change that fact. I see no authority to suggest otherwise. The Mate's Receipts are not binding contractual documents in these circumstances, and Shanghai Fareast should not be held in a position to rely on these, given that the relevant information on which they seek to rely is, or should be, fairly within their own or their principal's knowledge.
[12] The bills should be dated with the precise date of shipment and not before.
[13] *Standard Chartered Bank v Pakistan National Shipping Corporation (the "Lalazar")* [2002] UKHL 43
[14] *The Chrysovalandou Dyo* [1981] 1 Lloyd's Rep. 159, at 165.

are marked "freight prepaid", has not been finally and conclusively determined. Mr Yang correctly advises (Mr Yang's Declaration para 19) that where bills of lading are marked "freight prepaid", a lien cannot be exercised over the cargo against innocent third parties (including receivers), and owners will be estopped from exercising such lien.

f. However, the endorsement "freight prepaid" may not deprive an owner of its right to exercise a lien on the cargo as against shippers, in circumstances where freight had not, in fact, been prepaid[15]. In the present case it is unclear whether freight had been pre-paid, and therefore whether a right of lien is available as against shippers.

g. On the basis of the above, it is far from clear whether the bills incorporate the lien clause in the bills of lading and/or whether, and to what extent, Navision is entitled to exercise a lien on the cargo even if such were incorporated.

h. The position on the facts is therefore far from clear cut. However, as matters stand, on the facts as we understand them, the Plaintiff does have a prima facie valid claim for infringement of its lien rights.

i. However, the legal analysis of this issue is theoretical. One should also have in mind that the law of the place where the lien was sought to be exercised is highly relevant in determining whether such lien can be exercised. I have been advised that Navision sought to exercise a lien on the cargoes at discharge ports both in Italy and Spain. I also understand that Navision was advised in both jurisdictions that it would not be possible to exercise a lien on the basis that the bills of lading were marked "freight prepaid". Therefore, irrespective of the strict legal position, Shanghai Fareast's deliberate failure and/or refusal to comply with the clear terms of the Letter of Authorisation, in issuing and releasing "freight prepaid" bills of lading, and this appears to have directly resulted in Navision being deprived of their right to exercise a lien on the cargo.

j. The fact that some bills were marked "freight collect" will not extinguish Navision's cause of action in these circumstances, although it may effect the quantum of any claim. Whether a lien could have been exercised on part cargo will depend upon numerous factors, including whether the cargo was clearly separable and/or identifiable etc.

k. Therefore, due to Shanghai Fareast's direct contravention of the express terms of the Letter of Authorisation, Navision was unable to exercise a lien on the cargo, and they have suffered significant loss and damage as a consequence. Under the terms of the Authorisation, Shanghai Fareast is prima facie fully responsible for the damages and consequential losses incurred as a result.

---

[15]    *Cho Yang Shipping Co. Ltd v Coral (UK) Ltd.*[1997] 2 Lloyd's Rep 641.

(4) **Under English law is Navision entitled to bring a claim against Shanghai Fareast in England ?**

    a. In summary, in accordance with the facts as presented to me, Navision have, in principle, a contractual right to lien cargo owned by third parties as long as the charter lien cause (clause 18) has been incorporated into the bills of lading (see para (3)d above). However, as a result of Shanghai Fareast's acts and/or omissions, Navision's right of lien was compromised either by:

        (i) If Shanghai Fareast failed to incorporate the charterparty lien clause into the bills of lading, then Navision would lose the right to exercise a lien against third parties (see paras (2)a-b and (3)d above); alternatively

        (ii) If Shanghai Fareast did incorporate the charterparty lien clause into the bills of lading, then by subsequently marking the bills "freight prepaid" Navision's right to exercise such lien was prejudiced, and in practice they were prevented from doing so (see paras (3)e-j above).

    Therefore, Navision would have a prima facie valid cause of action under English law against Shanghai Fareast, irrespective of whether or not Navision was a strict party to the bill of lading.

    b. Furthermore, as regards Shanghai Fareast, if as alleged, they issued and released freight prepaid, clean on board and antedated bills of lading, this is in express variance with the terms of the Letter of Authorisation. As the Letter of Authorisation is a binding agreement, Navision has a prima facie valid cause of action against Shanghai Fareast for breach of contract and/or tort.

    c. Furthermore, where loss, damage or injury is caused to any third party by any wrongful act or omission of an agent while acting on behalf of his principal (including a tortuous act such as knowingly signing false bills of lading) the agent is personally liable, whether he is acting with the authority of the principal or not[16].

    d. Accordingly, based on the facts as advised to me, it is my opinion that Navision has a prima facie valid maritime claim against Shanghai Fareast for infringing upon its right to lien the cargo under English law. And, while Shanghai Fareast has presented some defences/arguments to the contrary, they are merely that, arguments. Plaintiff has certainly presented enough facts to make/raise a prima facie valid claim against Shanghai Fareast. The ultimate merits of the case will have to be decided in the underlying proceeding. However, Defendant's argument that Plaintiff cannot/has not presented a prima facie valid claim under English law is incorrect.

---

[16]     <u>Bowstead & Reynolds on Agency</u> at 9-112

HFWGR\152612-1         10

16. For the reasons I have set out above, I am of the view that Navision has a valid prima facie maritime claim against Shanghai Fareast under English Law. Navision's claim is an independent and direct claim against Shanghai Fareast and is not based on indemnity nor is it contingent on obtaining an award against Charterers.

17. Finally, my advice above has been provided on the presumption that English law applies. A formal examination of the proper law governing this dispute is not within the scope of this Declaration. However, I note that both the 18 April and 12 July charterparties are governed by English law. If the relevant bills of lading incorporate the terms and conditions of either of the above charterparties, then English law will also govern the bills.

18. Moreover, there is an argument that the Letter of Authorisation (which derives from the sub-charter but does not contain a choice of law and jurisdiction clause) will also be governed by English law, as this law appears to be the proper law with which the contract has the closest and most real connection. Therefore, there is a respectable argument that English law should govern the disputes.

19. If a dispute such as this would be brought in an English Court, then I would estimate that it would take up to three years to resolve the underlying matter in litigation in London. The Court has power to award compound interest on its principal claim, if requested to do so. Otherwise, the usual principle is that simple interest will be awarded at the base rate of the subject currency plus 1%. For US Dollars, the current applicable base rate is about 6%. We are unable to advise with specificity on the likely estimate for the litigation costs and attorney fees for bringing a case such as this to trial in England but, on a preliminary basis would advise that the figures of $50,000.00 and $200,000.00 respectively appear reasonable.

I do so declare under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America that the aforegoing is true to the best of my knowledge and that the opinions expressed herein are correct.

Dated     3 March 2008
          Piraeus, Greece

Signed    [signature]
          **Nikolai C. Ivanov**